UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

BENIGNO PEREZ-AGUILAR,

                Petitioner,              Case No. 1:22-cv-1070

v.                                     Honorable Jane M. Beckering

JAMES CORRIGAN,

                Respondent.

_____/

## OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Benigno Perez-Aguilar is incarcerated with the Michigan Department of Corrections at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan. On November 8, 2019, following a four-day jury trial in the Kent County Circuit Court, Petitioner was convicted of first-degree criminal sexual conduct (CSC-I), in violation of Michigan Compiled Laws § 750.520b, and second-degree criminal sexual conduct (CSC-II), in violation of Michigan Compiled Laws § 750.520c. On December 10, 2019, the court sentenced Petitioner to concurrent prison terms of 25 to 40 years for the CSC-I conviction and 5 to 15 years for the CSC-II conviction.

On November 16, 2022, Petitioner filed his habeas corpus petition raising the following three grounds for relief:

> I.     Expert testimony from Thomas Cottrell did nothing more than bolster [the victims' testimonies]. The trial court abused its discretion in letting Dr. Cottrell testify.
>
> II.    Trial counsel's errors permitted the state to bolster its key witness with inadmissible hearsay and improper character evidence. Counsel violated Petitioner's Sixth Amendment right to counsel.

III.     Plain error occurred when the state elicited inadmissible hearsay from three witnesses.

(Pet., ECF No. 1, PageID.3.) Respondent asserts that Petitioner's grounds for relief are meritless.[1]

(ECF No. 8.) For the following reasons, the Court concludes that Petitioner has failed to set forth

a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of

habeas corpus.

<u>Discussion</u>

## I.   Factual Allegations

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as

follows:

> In July 2015, CR, an 11-year-old girl, texted a picture of her leg with a knife and the question, "Should I do it?" to her cousin, ZP. ZP told CR "no," and she repeatedly and constantly attempted to call CR. Although they did not speak on the phone that night, CR disclosed via text message that [Petitioner] started abusing her when he was dating CR's mother, which was when CR was six years old. CR told ZP that [Petitioner] "showed me what sex was, and of course I followed along because I was so young and didn't know that much." She also texted she was seven "when it really started" and that when she was living on Godfrey "we did the 69." CR explained to ZP that she performed oral sex on [Petitioner's] penis did not like him to touch her "stuff." She also disclosed that [Petitioner] would watch pornography with her. ZP got permission from CR to tell CR's mother about the sexual abuse.

---

[1] Respondent also contends that some of Petitioner's grounds for relief are procedurally defaulted. (ECF No. 8, PageID.96–97.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. MaCauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

CR's mother reported the sexual assault to the police. After receiving the report, the police spoke with CR and her mother and determined that CR should be interviewed at the Children's Assessment Center (CAC). Thereafter, CR was interviewed by Allie Rauser, a trained forensic interviewer. Rauser testified that CR disclosed that [Petitioner] sexually assaulted her. In particular, she testified to CR's statements that: (1) [Petitioner] performed a "69" on her, (2) that the abuse occurred between when she was six and when she was ten, (3) that the abuse occurred between three and five times per week, (4) that on two occasions she was abused three times per day, (5) that she was sexually abused by [Petitioner] two weeks before the interview at the CAC, (6) that [Petitioner] introduced her to pornography when she was six years old, (7) that the pornography consisted of adult "girls sucking on penises," and (8) that something that looked like shampoo came out of [Petitioner's] penis. Rauser also described a number of demonstrations that CR used to show how the abuse occurred, including demonstrating "humping" by moving "her body in an upward and downward motion," and by making a C-shape with her hand and moving it up and down to show how [Petitioner] made her touch his penis.

CR was also interviewed by Amy Minton, a medical social worker with the CAC. Minton testified that the purpose of her interview was to gather information to assist the physician by "identifying what parts of the body may have been affected, so that way the physician knows which body parts to really check out, to know if they need to go further with testing, STI testing, pregnancy testing, that sort of thing." She testified that CR told her that "her mom's boyfriend had done things to her— to her body" and that she talked "about things that happened to her private parts." Minton stated that CR told her that [Petitioner] would initiate the sexual abuse by saying that they were going to play a game. Minton testified that CR elaborated that [Petitioner] touched her vagina with his hand, mouth, and penis, and that he made her touch his penis with her hand and her mouth. She also stated that CR "said most of the time when he had her hand and mouth on his penis something came out that looked like shampoo." CR told Minton that [Petitioner's] penis "was on her vagina," but that it did not penetrate it.

At trial, CR testified that she was five or six years old when [Petitioner], her mother's boyfriend at the time, touched her vagina. At the time she was living on Sharon Avenue, but the abuse also happened when she was living on Godfrey. She also testified that he touched her vagina with his mouth and his penis. CR described that [Petitioner] also instructed her to put her mouth on his penis while his mouth was on her vagina. She said that happened "more than once." She stated that sex position was called "the 69," which she learned because [Petitioner] told her that was what it was called. CR stated that a couple of times sperm, which she described as whiteish in color, would come out of his penis, but he usually just went to the bathroom. CR demonstrated how [Petitioner] showed her how to touch his penis and she explained that the first couple of times he put his hand over hers.

CR also testified that [Petitioner] would make her watch pornography with him. She stated that the pornography was "videos of people having sex and stuff." She

did not remember exactly what the people in the video were doing or if they were wearing clothes, but remembered that they were adults. While crying, CR stated that [Petitioner] would tell her that if she told anyone she would be taken away from her mother.

CR also testified to a specific incident that occurred when she was living on Godfrey the second time. She had a nightmare and went to her mother's room to sleep. While she was there, [Petitioner] "touched [her] butt." Although she did not want to tell her mother about the contact, she testified that when she was ten or eleven she told her mother that she "thought he did" touch her buttocks. She stated that she told her mother about that contact because she "didn't want him to be with us no more." She stated that a couple months later, she disclosed the abuse to ZP.

CR stated that after disclosing the abuse, she spent time in therapy related to it. She also testified to cutting herself with a knife on a number of occasions. CR's mother testified that on one occasion, she woke up to CR standing over her bleeding from cutting herself. At trial, CR explained that she had not cut herself in over a year. In addition to the testimony regarding the abuse [Petitioner] inflicted on CR, the prosecutor presented other-acts testimony that [Petitioner] sexually assaulted GF. GF testified that when she was four or five years old her mother was dating [Petitioner]. One night while her mother was at work, she went into her mother's bedroom to check on her baby brother. While she was in the room, [Petitioner] entered. He made her watch pornography and insinuated that he wanted her to do to him what she saw the people on the video doing. She stated that he grabbed her, placed her on the bed, pulled her pants down, and inserted his penis into her vagina. After, she went to her bedroom and locked the door. [Petitioner] warned her that if she told anyone what happened, he would be separated from the family and her brother would grow up without a father.

GF testified that [Petitioner] continued to sexually assault her by touching her while she was asleep in her bedroom, by putting pornography on the television, and by performing oral sex on her. She added that he performed oral sex on her while telling her to perform oral sex on him at the same time. [Petitioner] continued to perform oral sex on her until she was 10 years, which was when she moved in with her aunt. GF added that [Petitioner] only penetrated her vagina two or three times. When she was 16 or 17 years old, she disclosed the abuse to a therapist, who then reported it to the police.

GF stated that she believed in karma and that she was testifying to bring "justice" to the situation. She also testified that she "would sleep a lot better at night knowing that [she] helped incarcerate a monster, basically." Similarly, CR's mother repeatedly described [Petitioner] as a monster.

The prosecution additionally presented testimony from Thomas Cottrell, an expert qualified in child sexual abuse dynamics. Cottrell testified that he had not interviewed either CR or GF and did not know anything regarding their disclosure. Instead, he testified to behaviors common among child sexual abuse victims,

including reasons for delayed disclosures, the effect of grooming behaviors on how the child might process the abuse, and the reasons why a child sexual abuse victim might engage in self-harm.

[Petitioner] testified on his own behalf. He denied abusing CR and GF, contending that he had no relationship with them and was never left alone with them. Instead, his relationship was with their respective mothers. He stated that the allegations made him sick to his stomach, noting that he "would not see an older man like me doing something to a little kid" and indicating that there would be "something wrong in the head" of somebody who would do things like that.

*People v. Perez-Aguilar*, No. 352055, 2021 WL 4428038, at *1–3 (Mich. Ct. App. Sept. 23, 2021) (footnotes omitted). "The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016) (footnote omitted).

A jury was initially selected on October 21, 2019. (ECF No. 9-4.) However, at a hearing held on October 23, 2019, the parties represented that the selected jury had not yet been sworn and that the assigned judge was unavailable to try the case until November 4, 2019. (ECF No. 9-5, PageID.389.) Based upon those representations, the matter was adjourned until November 4, 2019, with the understanding that a new jury would be selected. (*Id.*)

The new jury was selected and sworn on November 4, 2019. (Trial Tr. I, ECF No. 9-6.) Over the course of two days, the Court heard testimony from numerous witnesses, including GF and CR, Dr. Cottrell, CR's mother, Rauser, Minton, and Petitioner himself. (Trial Tr. II & III, ECF Nos. 9-7 and 9-8.) On November 8, 2019, after about two hours of deliberation, the jury reached a guilty verdict. (Trial Tr. IV, ECF No. 9-9, PageID.964.) Petitioner appeared before the trial court for sentencing on December 11, 2019. (ECF No. 9-1, PageID.164.)

Petitioner, with the assistance of counsel, appealed his convictions and sentences to the Michigan Court of Appeals, raising the three claims he now asserts in his federal habeas petition. (ECF No. 9-10, PageID.1095.) The court of appeals affirmed Petitioner's convictions and

sentences on September 23, 2021. *See Perez-Aguilar*, 2021 WL 4428038, at *1. The Michigan

Supreme Court denied Petitioner's application for leave to appeal on May 31, 2022. *See People v.*

*Perez-Aguilar*, 974 N.W.2d 214 (Mich. 2022). This § 2254 petition followed.

## II.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions

are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685,

693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated

pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on

the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established federal law as determined by the Supreme Court
> of the United States; or (2) resulted in a decision that was based upon an
> unreasonable determination of the facts in light of the evidence presented in the
> state court proceeding.

28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit

precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of

the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal

quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard

is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation

marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.

28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not

consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000);

*Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal

law" does not include decisions of the Supreme Court announced after the last adjudication of the

merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to

an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate

courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits." *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.    Discussion

### A.    Admission of Expert Testimony

As his first ground for relief, Petitioner contends that the trial court abused its discretion by allowing Dr. Cottrell to testify as an expert. (Pet., ECF No. 1, PageID.3.) Petitioner argues that Dr. Cottrell's testimony "did nothing more than bolster" the testimony given by GF and CR. (*Id.*)

Petitioner raised this claim on direct appeal, and the court of appeals rejected it. The court concluded that Cottrell's testimony was admissible under the Michigan Rules of Evidence and did not impermissibly vouch for the victim's credibility. *Perez-Aguilar*, 2021 WL 4428038, at *3–5. The court of appeals did not expressly address Petitioner's claim as a federal constitutional issue.

First, the court of appeals rejected Petitioner's argument that Cottrell's testimony "was improper because it allowed the prosecutor to connect the behavior of typical sexual assault victims with behavior displayed by CR and GF." *See Perez-Aguilar*, 2021 WL 4428038, at *4. The court of appeals noted that both CR and GF delayed reporting the abuse, and that Cottrell "testified regarding delayed disclosure, the effect of grooming behavior, however childhood sexual assault victims process sexual abuse, and the reasons why a victim of childhood sexual abuse might resort to self-harm." *Id.* The court of appeals concluded that the trial court did not abuse its discretion in permitting such testimony because it was "limited to an explanation of the commonality seen in victims of child sexual abuse with respect to those areas." *Id.*

Petitioner also challenged Cottrell's response to a question posed by the prosecutor, arguing that Cottrell's response "improperly vouched for CR['s] credibility because his assurance that fabrication occurs 'very rarely' was the equivalent of an impermissible expert opinion on the credibility of a child sexual abuse victim." *Id.* The court of appeals noted that such testimony "could have amounted to improper vouching," but that Petitioner had failed to demonstrate that the admission of such testimony was outcome determinative. *Id.* at *5. In making that conclusion, the court of appeals noted that Cottrell's properly admitted testimony concerning grooming activities and delayed disclosure, coupled with CR's testimony concerning the abuse, allowed the jury to "reasonably infer that CR's disclosure of sexual abuse was credible." *Id.* CR's mother's testimony also corroborated CR's testimony. *Id.* Finally, GF provided other acts evidence concerning her abuse by Petitioner. *Id.* Overall, the court of appeals noted, the "evidence that [Petitioner], under similar circumstances, abused both girls in a similar manner, is compelling evidence supporting his convictions." *Id.*

"The admission of expert testimony in a state trial presents a question of state law which does not warrant federal habeas relief unless the evidence violates due process or some other federal constitutional right." *Randolph v. Wolfenbarger*, No. 04-CV-73475, 2006 WL 1662885, at *5 (E.D. Mich. June 12, 2006) (citing *Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001)); *see also Adesiji v. Minnesota*, 854 F.2d 299, 300 (8th Cir. 1988) (whether expert testimony regarding general patterns of credibility among children reporting sexual abuse was properly admissible was "essentially a matter of state law"). "Similarly, a determination as to whether an individual is qualified to give expert testimony involves only a state law evidentiary issue." *Randolph*, 2006 WL 1662885, at *5 (citing *United States ex. Rel. Ruddock v. Briley*, 216 F. Supp. 2d 737, 743 (N.D. Ill. 2002)).

Here, Petitioner's attempt to shoehorn his claim into one that is cognizable on habeas review is insupportable. As noted above, Petitioner argues that Dr. Cottrell essentially vouched for GF and CR's credibility. A review of the record, however, cannot lead to a conclusion other than that the court of appeals correctly noted that Dr. Cottrell did not offer testimony regarding the truthfulness of their accusations and whether they were abused by Petitioner. Petitioner's suggestion that Dr. Cottrell usurped the province of the jury is simply incorrect.

Moreover, it is not clearly established federal law that expert testimony regarding the credibility of a complainant's accusations violates due process. The lower federal courts offer authority supporting the proposition that opinion testimony regarding the credibility of other witnesses is inappropriate. *See, e.g.*, *United States v. Hill*, 749 F.3d 1250 (10th Cir. 2014) (collecting federal circuit court authority); *Esch v. Cnty. of Kent*, 699 F. App'x 509, 517 (6th Cir. 2017) (citing *Hill*); *Greenwell v. Boatwright*, 184 F.3d 492, 495–97 (6th Cir. 1999) (stating with regard to the expert's testimony "as to the validity of statements made by other witnesses . . . we

agree with the plaintiffs that the expert statements were inadmissible opinion testimony . . .”). But that authority is focused on whether the testimony is permissible under the Federal Rules of Evidence and, even with that non-constitutional focus, there is no Supreme Court authority stating that proposition. *Hill*, 749 F.3d at 1258 (relying on “the ‘weight of authority from other circuits’ . . . [in the] absen[ce of] a holding from. . . the Supreme Court”).

Furthermore, the fundamental premise of much of the lower court authority—that expert testimony regarding witness credibility is inappropriate because it invades the province of the jury[2]—has been called into question by the Supreme Court. In 1943, the Supreme Court interpreted the Federal rules of Evidence and considered the admissibility of expert testimony that was challenged on the basis that it “invaded the jury’s province.” *United States v. Johnson*, 319 U.S.

---

[2] That is also the premise of the state law limitation on such evidence. Michigan law holds that a witness may not provide an opinion on the credibility of another witness:

> It is “[t]he Anglo-Saxon tradition of criminal justice . . . [that] makes jurors the judges of the credibility of testimony offered by witnesses.” *United States v. Bailey*, 444 U.S. 394, 414, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980). Because it is the province of the jury to determine whether “a particular witness spoke the truth or fabricated a cock-and-bull story,” *id*. at 414 415, 100 S. Ct. 624, it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial. *People v. Buckey*, 424 Mich. 1, 17, 378 N.W.2d 432 (1985). *See also People v. Peterson*, 450 Mich. 349, 352, 537 N.W.2d 857 (1995). Such comments have no probative value, *Buckey*, 424 Mich. at 17, 378 N.W.2d 432, because “they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence.” *Connecticut v. Taft*, 306 Conn. 749, 764, 51 A.3d 988 (2012) (citation and quotation marks omitted). *See also People v. Row*, 135 Mich. 505, 507, 98 N.W. 13 (1904) (explaining that opinion testimony regarding a complainant’s veracity is not competent evidence). As a result, such statements are considered “superfluous” and are “inadmissible lay witness [ ] opinion on the believability of a [witness’s] story” because the jury is “in just as good a position to evaluate the [witness’s] testimony.” *People v. Smith*, 425 Mich. 98, 109, 113, 387 N.W.2d 814 (1986).

*People v. Musser*, 494 Mich. 337, 835 N.W.2d 319, 327 (2013) (footnote omitted).

503, 519 (1943). The Supreme Court was not troubled by the fact that the expert testified regarding ultimate issues:

> No issue was withdrawn from the jury. The correctness or credibility of no materials underlying the expert's answers was even remotely foreclosed by the expert's testimony or withdrawn from proper independent determination by the jury. The judge's charge was so clear and correct that no objection was made, though, of course, there were exceptions to the refusal to grant the usual requests for charges that were either redundant or unduly particularized items of testimony. The worth of our jury system is constantly and properly extolled, but an argument such as that which we are rejecting tacitly assumes that juries are too stupid to see the drift of evidence. The jury in this case could not possibly have been misled into the notion that they must accept the calculations of the government expert any more than that they were bound by the calculations made by the defense's expert based on the defendants' assumptions of the case. So long as proper guidance by a trial court leaves the jury free to exercise its untrammeled judgment upon the worth and weight of testimony, and nothing is done to impair its freedom to bring in its verdict and not someone else's, we ought not be too finicky or fearful in allowing some discretion to trial judges in the conduct of a trial and in the appropriate submission of evidence within the general framework of familiar exclusionary rules.

*Johnson*, 319 U.S. at 519–20. Federal Rule of Evidence 704(a)[3] expressly states that "[a]n opinion is not objectionable just because it embraces an ultimate issue." *Id*. Federal Rule of Evidence 704 was passed for the express purpose of abolishing case law that held that witnesses could not express opinions on ultimate issues. *See* Advisory Committee Notes, Fed. R. Evid. 704. In *Scheffer*, in a concurring opinion, Justice Kennedy quoted the Advisory Committee Notes to explain the change:

> The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions. The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. 7 Wigmore §§ 1920, 1921; McCormick § 12. The basis usually assigned for the rule, to prevent the witness from "usurping the province of the jury," is aptly characterized as "empty rhetoric." 7 Wigmore § 1920, p. 17.

*Scheffer*, 523 U.S. at 319.

---

[3] The parallel Michigan Rule of Evidence is virtually identical. *See* Mich. R. Evid. 704.

Even if the Supreme Court concluded that the Federal Rules of Evidence did not allow expert testimony regarding witness credibility, that would not be sufficient to permit habeas relief. Where "the Supreme Court has addressed whether . . . testimony is permissible under the Federal Rules of Evidence . . . [but] it has not explicitly addressed the issue in constitutional terms . . . there is no Supreme Court precedent that the trial court's decision could be deemed 'contrary to,' under the AEDPA." *Bugh*, 329 F.3d at 513.

Overall, whether or not expert opinion testimony regarding witness credibility was properly admitted under state law, or even the Federal Rules of Evidence, is an entirely separate question from whether the evidence violates due process. In light of the United States Supreme Court's decision in *Johnson*, and the express disavowal of the notion that expert testimony on an "ultimate issue" is objectionable, the Court concludes that even if the expert testimony addressed the ultimate issue of GF and CR's credibility, it would not violate the clearly established law regarding the limits of due process.

Because Petitioner cannot demonstrate that Dr. Cottrell's testimony violated his due process rights, he cannot show that the court of appeals' rejection of his claim is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to habeas ground I.

**B.      Admission of Hearsay**

As habeas ground III, Petitioner contends that "[p]lain error occurred when the state elicited inadmissible hearsay from three witnesses." (Pet., ECF No. 1, PageID.3.) Specifically, Petitioner alleges that the trial court allowed Minton, Rauser, and ZP to offer inadmissible hearsay that "bolstered [CR's] account." (Br. Supp. Pet., ECF No. 2, PageID.38.) Specifically, Petitioner contends that ZP was permitted to "relay[] [CR's] out-of-court disclosure accusing Petitioner of sexual abuse." (*Id.*, PageID.27.) Petitioner argues further that Rauser and Minton were permitted

13

"to recount more of [CR's] graphic out-of-court statements during their testimony." (*Id.*, PageID.28.)

Petitioner challenged the admission of testimony from these three witnesses as inadmissible hearsay on direct appeal, and the court of appeals addressed each contention in turn. First, the court of appeals agreed with the prosecution that Minton's testimony was not inadmissible hearsay because, pursuant to Michigan Rule of Evidence 803(4), CR's statements to Minton "were made for the purpose of medical treatment or diagnoses." *Perez-Aguilar*, 2021 WL 4428038, at *6. The court of appeals noted that "Minton testified that the information she gathered was given to the physician to aid in CR's medical examination. She also explained that the information was used to develop a safety plan for CR." *Id.* at *7.

With respect to ZP, the prosecution conceded that some of her testimony consisted of inadmissible hearsay. *Id.* The court of appeals agreed that the following testimony was inadmissible hearsay:

> Specifically, ZP testified that CR disclosed that [Petitioner] started abusing her sexually when she was six, that she followed along with the abuse because of her young age, that the "69" sex position was introduced to her when she lived on Godfrey, that she performed oral sex on Perez-Aguilar, that he touched her "stuff," and that [Petitioner] made her watch pornography. CR's description of the sexual abuse [Petitioner] inflicted on her was offered for the truth of the matter asserted, i.e., to prove that [Petitioner] had abused her in the manner indicated.

*Id.*

The court of appeals next addressed Rauser's testimony, stating:

> Next, the prosecution argues on appeal, that although some of Rauser's testimony was inadmissible hearsay, other aspects of her testimony were not. We agree that Rauser's testimony regarding CR's demeanor and the manner in which she responded to questions were not inadmissible hearsay. However, we disagree with the prosecutor's argument that Rauser's testimony that CR demonstrated certain things was not hearsay because it was not offered to show that [Petitioner] actually engaged in that type of behavior with CR. Rauser testified that CR's demonstration of humping was to show how [Petitioner] humped her during one incident, and Rauser stated that C-shape and hand motions was used by CR to show how CR

touched [Petitioner's] penis. For purposes of hearsay, a statement includes "nonverbal conduct of a person, if it is intended by the person as an assertion." MRE 801(a). Based on Rauser's recitation of what CR was communicating when she made her nonverbal demonstrations, it is plain that CR was asserting that [Petitioner] had humped her and that she had touched his penis in the manner indicated. Because the statements were offered to prove the truth of the matter asserted, they were inadmissible hearsay. *See* MRE 801(c).

Moreover, Rauser testified to inadmissible hearsay when she repeated CR's statements to her that [Petitioner] abused her three to five times per week when she was between the ages of six and ten, that he made her give him oral sex while he gave her oral sex, that he made her watch pornography consisting of "girls sucking penises," and that while [Petitioner] was abusing her it looked like shampoo came from his penis.

*Id.* at *8.

To the extent that Petitioner asserts that the court of appeals erred in concluding that the testimony given by Minton and part of the testimony given by Rauser did not constitute inadmissible hearsay, he fails to state a claim upon which habeas relief may be granted. State courts are the final arbiters of state law, and the federal courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67–68.

It is not inconceivable, however, that evidence properly admitted under state law might still have the effect of rendering Petitioner's trial unfair. State court evidentiary rulings, though,

"cannot rise to the level of due process violations unless they offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (internal quotation marks omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach affords the state courts wide latitude for ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Moreover, under the AEDPA, a federal court may not grant relief if it would have decided the evidentiary question differently. A federal court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law, or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000); *see also Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (stating that, to obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify "'a Supreme Court case establishing a due process right with regard to the specific kind of evidence' at issue"). Petitioner, however, has not met this difficult standard; he does not even cite any Supreme Court authority in support of this ground for relief.

There is nothing inherent in the admission of hearsay testimony generally that offends fundamental principles of justice. In fact,

> [t]he first and most conspicuous failing in [arguing that hearsay testimony violates due process] is the absence of a Supreme Court holding granting relief on [that] theory: that admission of allegedly unreliable hearsay testimony violates the Due Process Clause. That by itself makes it difficult to conclude that the state court of appeals' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

*Desai v. Booker*, 732 F.3d 628, 630 (6th Cir. 2013) (quoting 28 U.S.C. § 2254(d)).

While hearsay itself is not constitutionally impermissible, in some instances, testimony regarding out-of-court statements might raise the specter of a violation of the Confrontation Clause. The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. Const. amend VI; *Pointer v. Texas*, 380 U.S. 400, 403–05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause, therefore, prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004). Here, however, no Confrontation Clause violation occurred because CR herself testified at Petitioner's trial.

Plaintiff has failed to show that the admission of any of the "hearsay" evidence violated his due process rights and, therefore, he has failed to demonstrate that the Michigan Court of Appeals' rejection of his claim is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief with respect to habeas ground III.

### C.    Ineffective Assistance of Counsel

In habeas ground II, Petitioner avers that trial counsel's "errors permitted the State to bolster its key witness with inadmissible hearsay and improper character evidence." (Pet., ECF No. 1, PageID.3.) Specifically, Petitioner asserts that trial counsel rendered ineffective assistance by failing to object to the testimony given by Minton, Rauser, and ZP that is discussed *supra*. (Br. Supp. Pet., ECF No. 2, PageID.27–33.) Petitioner also faults counsel for not objecting to GF and YR's testimony calling Petitioner a "monster," suggesting that was improper character evidence. (*Id.*, PageID.34.)

17

### 1.      Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential," per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. And then scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d). In light of

that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised his assertions of ineffective assistance of counsel on direct appeal, and the court of appeals addressed them under the following standard: "To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Perez-Aguilar*, 2021 WL 4428038, at *6 (quoting *People v. Shaw*, 892 N.W.2d 15, 20 (Mich. Ct. App. 2016)). In *Shaw*, the court of appeals identified *Strickland* as the source of the standard. *See Shaw*, 892 N.W.2d at 20. Thus, there is no question that the court of appeals applied the correct standard.

The court of appeals' application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within

§ 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the court of appeals applied the correct standard, Petitioner can only overcome the deference afforded state court decisions if the determination regarding Petitioner's ineffective assistance claims is an unreasonable application of *Strickland* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d). The Court, therefore, will consider whether the court of appeals reasonably applied the standard for Petitioner's claims of ineffective assistance of counsel.

### 2.    Analysis

#### a.    Failure to Object to Hearsay

Petitioner first faults counsel for not objecting to the instances of alleged inadmissible hearsay discussed *supra* in Part III.B.

Petitioner starts by challenging counsel's failure to object to the alleged hearsay testified to by Minton. However, as discussed *supra*, the court of appeals concluded that Minton's testimony was admissible under Michigan Rule of Evidence 803(4) because it consisted of information that Minton gathered to aid in CR's medical examination and to develop a safety plan for CR. *Perez-Aguilar*, 2021 WL 4428038, at *7. The court of appeals noted further that, "given that Minton's testimony was admissible under MRE 803(4), [Petitioner] cannot show that his lawyer's performance was deficient when he failed to object to Minton's recitation of CR's

statements." *Id.* Thus, because the court of appeals concluded that such testimony was properly admitted, it was not professionally unreasonable for trial counsel to fail to object to this testimony, as any objection would have been futile. *See Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) (stating that "[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial.").

Petitioner next faults counsel for failing to object to the inadmissible hearsay testimony given by Rauser and ZP. As thoroughly discussed *supra*, the court of appeals concluded that certain testimony offered by both Rauser and ZP consisted of inadmissible hearsay. *See Perez-Aguilar*, 2021 WL 4428038, at *7–8. In light of that finding, the court of appeals concluded that counsel's failure to object to such testimony "fell below an objective standard of reasonableness." *See id.* The court of appeals, however, then determined that Petitioner was not prejudiced by counsel's failure to object, stating:

> Having concluded that [Petitioner's] lawyer's performance fell below an objective standard of reasonableness as it relates to hearsay statements by ZP and Rauser, we must evaluate whether, but for those errors, there is a reasonable probability that the outcome of the trial would have been different. We conclude that [Petitioner] cannot show outcome determinative error. Again, contrary to his argument on appeal, this case did not turn solely on a credibility contest between CR and [Petitioner]. Instead, as explained above, the jury also heard expert testimony allowing it to infer that CR's behaviors, which included a delayed disclosure and self-harm, were common in childhood sexual assault victims. They also heard other-acts testimony from RF detailing the eerily similar abuse that [Petitioner] inflicted on her when he was dating RF's mother and when RF was in the same age range as CR was when she was abused. Moreover, although ZP and Rauser's testimony allowed the jury to hear CR's disclosure two additional times, the statements were cumulative to CR's trial testimony. *See People v Crawford*, 187 Mich. App. 344, 353; 467 N.W.2d 818 (1991) (stating that the erroneous admission of hearsay was harmless because it was cumulative to other properly admitted evidence); and (stating that when "the declarant himself testified at trial, any likelihood of prejudice was greatly diminished because the primary rationale for the exclusion of hearsay is the inability to test the reliability of out-of-court statements."). In sum, given the record in this case, we conclude that there is not a reasonable probability that, but for his lawyer's failure to object to inadmissible hearsay, the result of the trial would have been different. For the same reasons, we

conclude that [Petitioner] cannot show that the admission of ZP and Rauser's testimony amounted to plain error affecting his substantial rights. *See Carines*, 460 Mich. at 763.

*See id.* at *8.

In his federal habeas petition, Petitioner presents only the arguments he presented to the court of appeals. Notably, Petitioner ignores the court of appeals' conclusion that the inadmissible hearsay testified to by ZP and Rauser was cumulative to the testimony provided by CR.

The court of appeals concluded that because the hearsay evidence was cumulative of the properly admitted testimony offered by other witnesses, exclusion of the hearsay evidence would not have changed the outcome. The appellate court considered and answered exactly the question that *Strickland* asks on the prejudice prong: "[is there] a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. But that still leaves the question—was the court of appeals' determination that the hearsay testimony was not prejudicial because it was cumulative of other evidence a reasonable application of clearly established federal law?

In *Wong v. Belmontes*, 558 U.S. 15 (2009), the Supreme Court concluded that adding cumulative evidence to what was already there "would have made little difference" such that Belmontes could not "establish *Strickland* prejudice." *Wong*, 558 U.S. at 22. More recently, the Sixth Circuit assessed whether the introduction of cumulative evidence could be considered prejudicial in *England v. Hart*, 970 F.3d 698 (6th Cir. 2020), stating:

> Next, England argues that the affidavit was corroborative, rather than cumulative, of the aspects of the Woodfork statements that the prosecution relied on. "[E]vidence that is merely cumulative of that already presented does not . . . establish prejudice." *Getsy v. Mitchell*, 495 F.3d 295, 313 (6th Cir. 2007) (en banc) (quoting *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006)). Determining what constitutes cumulative evidence can be difficult, as "[o]ur cases . . . do not tell us clearly when evidence becomes sufficiently different to no longer be 'cumulative' or at what level of generality one must compare the evidence." *Vasquez v. Bradshaw*, 345 F. App'x 104, 120 (6th Cir. 2009). Our most frequent formulation

of the standard is that "new evidence" is not cumulative if it "differs both in strength and subject matter from the evidence actually presented at [trial]." *Goodwin v. Johnson*, 632 F.3d 301, 327 (6th Cir. 2011).

*England*, 970 F.3d at 714–15.[4] Under the *England* standard, ZP's and Rauser's recounting of the victim's reports to them was plainly cumulative to the victim's testimony as well as the testimony of RF, RF's mother, Minton, and the expert. The small portions of ZP's and Rauser's testimony that the court of appeals deemed inadmissible did not materially differ in "strength" or "subject matter" from the victim's trial testimony and there was nothing about the timing or circumstance of the disclosures that lent any meaningful corroborative value to the testimony. Therefore, introduction of the hearsay testimony did not make a difference sufficient to establish *Strickland* prejudice. Put differently, Petitioner has failed to show that the state appellate court's resolution of this claim is contrary to, or an unreasonable application of, clearly established federal law. Therefore, he is not entitled to habeas relief on this claim.

---

[4] The Sixth Circuit has found the court of appeals' reasoning persuasive in multiple cases. *See, e.g.*, *Barnes v. Warden, Ross Corr. Inst.,* No. 19-3389, 2019 WL 5576345, at *2 (6th Cir. Sept. 16, 2019) ("Review of the record confirms that Andrews's testimony—whether hearsay or not—was cumulative to Martin's own testimony about the incident. Even assuming the testimony did amount to hearsay, Barnes cannot make a substantial showing that counsel's failure to object resulted in prejudice."); *Dobbs v. Trierweiler,* No. 16-2209, 2017 WL 3725349, at *2 (6th Cir. Apr. 7, 2017) ("[T]he testimony as cumulative with regard to the second shooting . . . [a]nd because the testimony was harmless, Dobbs could not show that his attorney's failure to object to it was objectively unreasonable or that prejudice resulted."); *Thurmond v. Carlton*, 489 F. App'x 834, 842 (6th Cir. 2012) ("Because Baxter's [hearsay] testimony was cumulative to the victim's, the lack of an objection (likely to be sustained) did not prejudice the defense."); *Anthony v. DeWitt*, 295 F.3d 554, 564 (6th Cir. 2002) ("[A]dmission [of the hearsay statements] would constitute harmless error because of our conclusion that they did not have a substantial and injurious effect or influence in determining the jury's verdict. . . . Prior to Regina Knox's testimony, there was sufficient corroborating testimony from John Knox and Mary Payne describing the events on the evening of Smith's murder, making Regina Knox's hearsay testimony in this regard cumulative. . . . [H]abeas petitioners are not entitled to relief based on trial error unless they can establish that the error resulted in actual prejudice . . . .").

### b.      Failure to Object to Character Evidence

Next, Petitioner faults counsel for not objecting to GF and YR (CR's mother) repeatedly

calling him a "monster" during their testimony. The court of appeals rejected this claim, stating:

> [Petitioner] next argues that his trial lawyer was ineffective because he did not
> object to [G]F and CR's mother repeatedly calling him a "monster." He contends
> that the repeated references to him being a monster improperly permitted the jury
> to vilify him and to sympathize with CR and GF. However, [Petitioner's] lawyer
> argued that the references to him being a monster showed that the witnesses were
> biased against him. Given [Petitioner's] use of the testimony, it is clear that his
> decision not to object to it was made for the strategic purpose of arguing that the
> witnesses were biased against him and that, as a result, their testimony was not
> credible. Thus, [Petitioner] cannot overcome the presumption that his lawyer's
> failure to object was strategic. *See People v Unger*, 278 Mich. App. 210, 242; 749
> N.W.2d 272 (2008) (explaining that there is a strong presumption of effective
> assistance of counsel and that defense lawyers are "given wide discretion in matters
> of trial strategy because many calculated risks may be necessary in order to win
> difficult cases.").

*Perez-Aguilar*, 2021 WL 4428038, at *8.

Here, Petitioner merely reiterates the same arguments he made in the state courts—

arguments that have already been rejected by the court of appeals. Petitioner presents no evidence,

much less clear and convincing evidence, to overcome the court of appeals' determination that

counsel's decision to not object to this characterization was strategic. Moreover, in light of CR and

GF's detailed testimony regarding the abuse they sustained at the hands of Petitioner, Petitioner

fails to demonstrate that any objection by counsel would have affected the outcome of his trial.

Petitioner, therefore, is not entitled to relief with respect to this assertion of ineffective assistance

of counsel.

### c.      Cumulative Effect

In his brief supporting his federal habeas petition, Petitioner appears to assert that the

combined effects of counsel's alleged ineffectiveness warrant habeas relief. (Br. Supp. Pet., ECF

No. 2, PageID.34.) The Court must consider the cumulative effect of such errors because "[e]rrors

that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *United States v. Hughes*, 505 F.3d 578, 597 (6th Cir. 2007) (quoting *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983)). "Thus, examining an ineffective assistance claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'" *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)). However, as discussed *supra*, the Court has concluded that Petitioner has failed to demonstrate that counsel was constitutionally deficient in any way. Thus, because Petitioner's individual claims of ineffective assistance lack merit, he cannot show that any alleged cumulative error violated his constitutional rights. *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

In sum, Petitioner has not demonstrated that the court of appeals' rejection of his various assertions of ineffective assistance of counsel was contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief with respect to habeas ground II.

## IV.   Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under

*Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

### <u>Conclusion</u>

The Court will enter a judgment denying the petition, as well as an order denying a certificate of appealability.

Dated:   <u>   March 18, 2024   </u>           <u>   /s/ Jane M. Beckering           </u>
                                                                    Jane M. Beckering
                                                                    United States District Judge